IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs August 19, 2021

**IN RE KAISONA B. ET AL.**

**Appeal from the Juvenile Court for Dyer County**
No. 7479     Jason L. Hudson, Judge
_____

**No. W2020-01308-COA-R3-PT**
_____

This is a termination of parental rights case. Appellant/Mother appeals the trial court's termination of her parental rights to the two minor children on the grounds of: (1) abandonment by failure to provide a suitable home, Tenn. Code Ann. §§ 36-1-113(g)(1) and 36-1-102(1)(A)(ii); (2) substantial non-compliance with the requirements of the permanency plans, Tenn. Code Ann. § 36-1-113(g)(2); (3) persistence of the conditions that led to the children's removal, Tenn. Code Ann. § 36-1-113(g)(3)(A); and (4) failure to manifest an ability and willingness to assume custody, Tenn. Code Ann. §36-1-113(g)(14). Appellant/Father appeals the termination of his parental rights on the grounds of: (1) substantial non-compliance with the requirements of the permanency plans; and (2) failure to manifest an ability and willingness of ability to assume custody. Both Mother and Father also appeal the trial court's determination that termination of their respective parental rights is in the children's best interest. Discerning no error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed and Remanded**

KENNY ARMSTRONG, J., delivered the opinion of the court, in which ARNOLD B. GOLDIN and CARMA DENNIS MCGEE, JJ., joined.

Barbara A. Deere, Dyersburg, Tennessee, for the appellant, Casey B.[1]

Noel H. Riley, II, Dyersburg, Tennessee, for the appellant, Christopher F.

Herbert H. Slatery, III, Attorney General and Reporter, and Kristen Kyle-Castelli, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

_____

[1] In cases involving minor children, it is the policy of this Court to redact the parties' names to protect their identities.

# OPINION

## I. Background

On June 19, 2018, Kaisona B. and Anthony B. (together, the "Children") were born to Appellant Casey B. ("Mother") in Dyer County, Tennessee. On the same day, the Department of Children's Services ("DCS") received a referral alleging that the Children were drug exposed based on Mother's positive drug screens for methamphetamine and amphetamine. The Children were placed in the hospital's Neonatal Intensive Care Unit ("NICU"). The Children's birth certificates did not list a father. However, through DNA testing, Appellant Christopher F.'s ("Father") paternity was established, and he was adjudicated to be the Children's father by order of January 4, 2019.

A few weeks after the Children were born, Mother again tested positive for methamphetamine on July 6, 2018. While the Children were still in the NICU, on July 9, 2018, the Juvenile Court for Dyer County ("trial court") executed an order placing the Children in the temporary custody of DCS. On their removal from Mother's custody, the Children were placed in a foster home where they have remained since July 9, 2018. By order of November 9, 2018, the trial court adjudicated the Children to be dependent and neglected based on Mother's methamphetamine use.

By October 2018, Father had been identified, and he became involved in the proceedings. At that time, he was incarcerated in Obion County on federal drug charges and was awaiting trial on those charges. Father's incarceration commenced on February 22, 2018, and he has remained incarcerated continuously throughout the pendency of this case.

The trial court appointed a guardian ad litem for the Children and appointed counsel for both parents. Nicholas Boyd served as the DCS family service worker and case manager for the Children beginning in February 2019. To address the concerns raised in this case, four permanency plans were developed during the custodial episode. The first permanency plan was created on August 9, 2018, and Mother participated in the plan's development and agreed with her responsibilities. Father was not included in the first plan because he had not yet been identified as the biological father. The first plan icluded the following responsibilities for Mother: (1) complete an alcohol and drug assessment; (2) complete a mental health intake assessment and follow all recommendations; (3) submit and pass all drug screens; (4) provide a safe and stable home; (5) attend a parenting class and demonstrate skills learned; (6) anyone living with her must submit to a background check and drug screens; (7) contact DCS within 24 hours with updated contact information; (8) maintain regular visitation with the Children; and (9) sign release of information forms. Mother's visits were scheduled on Mondays and Wednesdays with two hours allotted for each visit.

A second plan was developed in December 2018. Mother's responsibilities under the second plan were the same as outlined in the first plan, with the added responsibilities that she complete a parenting assessment with an alcohol and drug component and provide proof of her prescriptions. Father was identified by this time, and he participated in the plan's development. The plan contained the following responsibilities for Father: (1) participate in mental health treatment; (2) complete a parenting class and learn how substance use impacts parenting; (3) submit to random drug screens; and (4) complete alcohol and drug treatment.

Father's responsibilities remained the same in the third and fourth plans. In the third permanency plan, which was created on January 28, 2019, Mother's responsibilities remained largely the same, except she was also required to complete a psychological assessment. The fourth plan, which was created on May 28, 2019, required both Mother and Father to complete all the requirements related to their legal charges and to refrain from accruing additional criminal charges. When the fourth plan was developed, Mother was not yet incarcerated. Under the plans, Mother was required to attend at least two, two-hour supervised visits per month. Both parents participated in the development of the plans. Both parents were presented with the Criteria and Procedures for Termination of Parental Rights, and both acknowledged the criteria.

On August 14, 2019, DCS petitioned the trial court to terminate Mother and Father's respective parental rights. As grounds for termination of Mother's parental rights, DCS alleged: (1) abandonment by failure to provide a suitable home; (2) failure to comply with the reasonable requirements of the permanency plans; (3) persistence of the conditions that led to the Children's removal from her custody; and (4) failure to manifest an ability and willingness to assume custody. As grounds for termination of Father's parental rights, DCS alleged: (1) failure to comply with the reasonable requirements of the permanency plans; and (2) failure to manifest an ability and willingness to assume custody.[2] DCS also averred that termination of Mother and Father's respective parental rights was in the Children's best interests.

The trial court heard the petition on August 14, 2020. In a written order filed on August 24, 2020, the trial court terminated Mother and Father's parental rights. However, the August 24, 2020 order failed to include conclusions of law pertaining to each ground. As such, this Court granted the parties' joint motion to remand for the trial court to consider a Tennessee Rule of Civil Procedure 60.02 motion to amend the final order to comply with the requirements in Tennessee Code Annotated section 36-1-113(k), which provides that, "The court shall enter an order that makes specific findings of fact and conclusions of law within thirty (30) days of the conclusion of the hearing."

On remand, the trial court entered an amended order on April 27, 2021. In this

---

[2] DCS also alleged the ground of abandonment by an incarcerated parent against Father but dismissed the ground prior to trial.

amended order, which is compliant with section 36-1-113(k), the trial court terminated Mother's parental rights on the grounds of: (1) abandonment by failure to provide a suitable home; (2) substantial noncompliance with the permanency plans; (3) persistence of conditions; and (4) failure to manifest an ability and willingness to assume custody. The trial court terminated Father's parental rights on the grounds of: (1) substantial noncompliance with the permanency plans; and (2) failure to manifest an ability and willingness to assume custody. The trial court also found that termination of both Mother and Father's parental rights was in the Children's best interest. Mother and Father appeal.

## II. Issues

We restate the dispositive issues as:

1. Whether there is clear and convincing evidence to support the trial court's termination of Mother's and/or Father's parental rights on any of the statutory grounds found by the trial court.

2. If so, whether there is clear and convincing evidence that termination of Mother's and/or Father's parental rights is in the Children's best interest.

## III. Standard of Review

The Tennessee Supreme Court has previously explained that:

A parent's right to the care and custody of [his or] her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clause of the federal and state constitutions. *Troxel v. Granville*, 530 U.S. 57, 65 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578-79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250. "'[T]he [S]tate as parens patriae has a special duty to protect minors. . . .' Tennessee law, thus, upholds the [S]tate's authority as parens patriae when interference with parenting is necessary to prevent serious harm to a child." *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also Santosky v. Kramer*, 455 U.S. 745 (1982); *In re Angela E.*, 303 S.W.3d at 250.

*In re Carrington H.*, 483 S.W.3d 507, 522-23 (Tenn. 2016) (footnote omitted). In Tennessee, termination of parental rights is governed by statute, which identifies "'situations in which that state's interest in the welfare of a child justifies interference with

a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought.'" *In re Jacobe M.J.*, 434 S.W.3d 565, 568 (Tenn. Ct. App. 2013) (quoting *In re W.B.*, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. Apr. 29, 2005) (citing Tenn. Code Ann. § 36-1-113(g))). Thus, a party seeking to terminate a parent's rights must prove: (1) the existence of one of the statutory grounds; and (2) that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c); *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

Considering the fundamental nature of a parent's rights and the serious consequences that stem from termination of those rights, a higher standard of proof is required in determining termination cases. *Santosky*, 455 U.S. at 769. As such, a party must prove statutory grounds and the child's best interest by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c); *In re Valentine*, 79 S.W. 3d at 546. Clear and convincing evidence "establishes that the truth of the facts asserted is highly probable . . . and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from evidence[,]" and "produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established." *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004).

In termination of parental rights cases, appellate courts review a trial court's factual findings de novo and accord these findings a presumption of correctness unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d); *In re Carrington H.*, 483 S.W.3d at 523-24 (citing *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010)); *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *In re A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007)). The Tennessee Supreme Court has explained that:

> The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. *In re M.L.P.*, 281 S.W.3d at 393 (quoting *In re [A.M.H.]*, 215 S.W.3d at 810). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d at 246.

*In re Carrington H.*, 483 S.W.3d at 524. With the foregoing in mind, we turn to our review.

### IV. Grounds for Termination of Parental Rights

Although only one ground must be proven by clear and convincing evidence in order to terminate a parent or guardian's parental rights, the Tennessee Supreme Court has instructed this Court to review every ground relied upon by the trial court to terminate parental rights in order to prevent "unnecessary remands of cases." *In re Angela E.*, 303

S.W.3d at 251 n.14. Accordingly, we will review all of the grounds relied upon by the trial court.

### A. Abandonment by Mother

The trial court found, by clear and convincing evidence, that Mother abandoned the Children by failure to provide a suitable home. Tennessee Code Annotated section 36-1-113(g) provides:

> (g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and nonexclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:
>
> (1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred;

Tenn. Code Ann. § 36-1-113(g)(1). Tennessee Code Annotated section 36-1-02(a)(A)(ii) defines "abandonment," in relevant part, as follows:

> (ii)(a) The child has been removed from the home or the physical or legal custody of a parent . . . by a court order at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and the child was placed in the custody of the department or a licensed child-placing agency;
>
> (b) The juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and
>
> (c) For a period of four (4) months following the physical removal, the department or agency made reasonable efforts to assist the parent . . . to establish a suitable home for the child, but that the parent . . . ha[s] not made reciprocal reasonable efforts to provide a suitable home and ha[s] demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a parent . . . in establishing a suitable home for the child shall be found to be reasonable if such efforts equal or exceed the efforts of the parent ... toward the same goal, when the parent ... is aware that the child is in the custody of the department;

Tenn. Code Ann. § 36-1-102 (1)(A)(ii).

- 6 -

Concerning the first statutory element, it is undisputed that the Children were removed from Mother's custody and placed in the custody of DCS by order of July 9, 2018, wherein the trial court found probable cause that the Children were dependent and neglected due to Mother's drug use. The Children were later adjudicated to be dependent and neglected on the same ground. Concerning section 36-1-102(1)(A)(ii)(b), in this case, "circumstances of the [Children's] situation prevented reasonable efforts from being made prior to removal." In its affidavits of reasonable efforts, DCS acknowledges that it "was unable to work services with the family prior to the children being placed in custody. There was not any viable family to take custody of the children." Nonetheless, the record shows that DCS made reasonable efforts to assist Mother in establishing a suitable home for at least a period of four months following the Children's removal, Tenn. Code Ann. § 36-1-102 (1)(A)(ii)(c); unfortunately, Mother failed to make reciprocal efforts to establish a suitable home. It is well settled that DCS' efforts to assist a parent "shall be found to be reasonable if such efforts equal or exceed the efforts of the parent . . . toward the same goal. . . ." Tenn. Code Ann. § 36-1-102(1)(A)(ii)(c). Additionally, "[a] suitable home 'requires more than a proper physical living location.'" *In re Navada N.*, 498 S.W.3d 579, 595 (Tenn. Ct. App. May 23, 2016) (quoting *In re Hannah H.*, No. E2013-01211-COA-R3-PT, 2014 WL 2587397, at *9 (Tenn. Ct. App. June 10, 2014)). It requires "[a]ppropriate care and attention . . . to the child[ren]." *In re Matthew T.*, No. M2015-00486-COA-R3-PT, 2016 WL 1621076, at *7 (Tenn. Ct. App. Apr. 20, 2016). Further, "a parent's compliance with counseling requirements is 'directly related to the establishment of a suitable home.'" *Id.* (citing *In re M.F.O.*, No. M2008-01322-COA-R3-PT, 2009 WL 1456319, at *5 (Tenn. Ct. App. May 21, 2009)). Indeed, "the problems and conditions for which the various . . . counseling efforts were conducted address matters[,] which make the home environment suitable for raising children. . . ." *In re M.F.O.*, 2009 WL 1456319, at *5.

In relevant part, DCS caseworker, Nicholas Boyd testified:

A. [DCS] provided [Mother] drug screens, 3 psychological assessments, we have asked for in-home services, we completed diligent searches at the time [Mother] wasn't able to be found . . . We asked that she complete a parenting assessment and put in case services for all of the assessments . . .

Q. Are you aware of any other services that the mother has worked herself to establish a suitable home other than the assessment that you mentioned earlier?

A. Not that I have been made aware of.

In its order terminating Mother's parental rights, the trial court specifically held:

The Department offered resources to Mother to assist her . . . . Mother, however, attended less than half of the scheduled visitations without

providing an explanation aside from the fact she was working, which only applied for approximately half of the time the case was pending. She declined transportation services to attend visitation. During the pendency of the first permanency plan created on August 9, 2018, Mother only completed an alcohol and drug assessment.

Mr. Boyd's testimony, and the record as a whole, supports the trial court's finding that despite DCS's efforts, Mother neither availed herself of those services nor reciprocated DCS's efforts to assist her in providing a suitable home for the Children. As such, the trial court held:

> Throughout the custodial episode, Mother failed 1[0] of 13 drug screens. No evidence was presented to rebut the validity of the drug screens, and Mother failed to provide a prescription for Ranitidine which she claimed caused false positives. . . . Mother's methamphetamine use was the reason the children were removed. No evidence was presented that [Mother] has stopped abusing drugs. She continued to fail drug screens throughout the case, including the last test that was administered in June 2019. Due to her current incarceration, she does not have a home or a legal means to support the children. Mother has had two years to establish a suitable home free that is also free from drugs. It appears unlikely that [Mother] will be able to provide a suitable home for the children at an early date.

As set out *infra*, Mr. Boyd testified that Mother failed 10 of the 13 drug screens she was given. In addition, Mr. Boyd testified that Mother was often out of communication with DCS, and he was unable to locate her despite his efforts, to-wit:

> I was unable to locate [Mother] or keep contact with her. During my time after [] 6/14/19 until she was arrested, I had made 3 home visits, went to who she reported was her current employer to check and see if she was there. She had reported she was fired due to theft. Then we also completed clear searches to see if [Mother] had moved and none of those efforts availed any contact with [Mother].

In November 2019, Mother was incarcerated on charges of conspiracy, aiding and abetting, and sale of methamphetamine. At the time of the hearing on the petition to terminate her parental rights, there was no projected release date. So, it is clear that Mother's living situation actually deteriorated from the time the Children came into DCS custody until the hearing in this case—a period of nearly two years. In that time, Mother continued to use illegal drugs as evidenced by her failed drug screens. She failed to maintain stable housing or employment and, thus, had no legal means of supporting the Children. Mother's failure to avail herself of the services offered by DCS during these proceedings clearly demonstrates that providing a suitable home for the Children was never

a primary concern for her. The fact that she is now incarcerated without a clear release date evinces the unlikelihood that she will be able to provide a suitable home for the Children at any early date. Accordingly, there is clear and convincing evidence to support the trial court's termination of Mother's parental rights on the ground of abandonment by failure to provide a suitable home.

## B. Persistence of Conditions by Mother

The trial court also terminated Mother's parental rights under Tennessee Code Annotated section 36-1-113(g)(3), a ground commonly referred to as "persistence of conditions." *In re Audrey S.*, 182 S.W.3d at 871. The persistence of conditions ground focuses "on the results of the parent's efforts at improvement rather than the mere fact that he or she had made them." *Id*. at 874. The goal is to avoid having a child in foster care for a time longer than reasonable for the parent to demonstrate the ability to provide a safe and caring environment for the child. *In re Arteria H.*, 326 S.W.3d 167, 178 (Tenn. Ct. App. 2010), *overruled on other grounds by In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015). Thus, the question before the court is "the likelihood that the child can be safely returned to the custody of the [parent], not whether the child can safely remain in foster care." *In re K.A.H.*, No. M1999-02079-COA-R3-CV, 2000 WL 1006959, at *5 (Tenn. Ct. App. July 21, 2000).

There are several elements to the ground of persistence of conditions:

(3)(A) The child has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:

(i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;
(ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and
(iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home;

(B) The six (6) months must accrue on or before the first date the termination of parental rights petition is set to be heard;

Tenn. Code Ann. § 36-1-113(g)(3)(A). Each of the statutory elements must be established by clear and convincing evidence. ***In re Valentine***, 79 S.W.3d 539, 550 (Tenn. Ct. App. 2002).

Here, the Children were removed from Mother's custody by order of July 9, 2018 and were later adjudicated to be dependent and neglected by order of November 9, 2018. The finding of dependency and neglect was based on Mother's drug abuse.

In its order terminating Mother's parental rights, the trial court found, in relevant part that:

> The conditions that led to the children's removal persisted throughout the case. Mother tested positive for amphetamine and methamphetamine in 10 out of 13 drugs screens administered. In the last drug screen she took, [Mother] also tested positive for THC. Mother's claim that her drug screens were false positives was not supported by any evidence. Further, she never provided a prescription that she was taking Ranitidine during the time she was testing positive for methamphetamine and amphetamine. In fact, her situation has worsened as she now faces federal drug charges with no trial date set.
>
> [Mother] could not provide a time frame for when her legal issues would be resolved. Mother's continued drug use and incarceration indefinitely prevent the children's safe return to [her] custody.
>
> The case has been pending for two years, and there is little likelihood that these conditions will be remedied at an early date so that the children can be safely returned. . . .  The children, who have the ability for permanency with the adoptive placement, would linger in foster care because Mother is unable to demonstrate that she can provide a suitable home free from illegal substances within a reasonable time. The children's chances of early integration diminishes while they wait for Mother to resolve her criminal charges, address her substance abuse issues, and obtain a home and legal source of income.
>
> Based on the evidence, this Court finds that clear and convincing evidence has been established that Mother has not remedied the persistent conditions that prevent reunification with the children.

Mr. Boyd's testimony supports the trial court's findings concerning Mother's continued drug use:

Q. Did the mother submit to drug screens for the Department?
A. She did.
Q. Roughly, how many drug screens was she requested to submit to?
A. 13 drug screens.

Q. Of those 13 drug screens, how many did she fail?
A. She failed all but 3. . . .

\*\*\*

Q. What did she fail those 10 for?
A. Her main drug screen[s] she failed for . . . were methamphetamine and amphetamine. On 6/19/10, I had completed a home visit with [Mother] and given her a drug screen then, and she has tested positive for methamphetamine, amphetamine, and THC.

Although Mother claimed that her use of Ranitidine caused her drug screens to produce false positives, as noted by the trial court, she "never provided a prescription that she was taking Ranitidine during the time she was testing positive for methamphetamine and amphetamine." It is clear that Mother's involvement with illicit drugs persists. In fact, Mother is now incarcerated facing federal charges involving the sale of methamphetamine. As of the hearing date, there was no indication of whether or when Mother would be released from incarceration. From the totality of the circumstances, there is little likelihood that Mother will remedy these persistent conditions at an early date so the Children can safely return to her custody. *See In re Eddie F.*, No. E2016-00547-COA-R3-PT, 2016 WL 7029285, \*7 (Tenn. Ct. App. Dec. 2, 2016), *perm. app. denied* (Tenn. March 2, 2017) ("[T]he question is the likelihood that the child can be safely returned to the custody of the parent, not whether the child can safely remain in foster care with periodic visits with the parent."). As the trial court found, almost two years after the Children were removed from her custody, "Mother is unable to demonstrate that she can provide a suitable home free from illegal substances within a reasonable time." *See Dep't of Children's Servs. v. B.B.M.*, No. E2006-01677-COA-R3-PT, 2007 WL 431251, at \*9 (Tenn. Ct. App. Feb. 9, 2007) ("Given that Mother has been unable to remedy these problems for many years, it is unlikely that these conditions would be remedied at any time in the near future."), This finding is supported by Mother's own testimony, to-wit:

Q [to Mother]. Do you currently have a home?

A. No, ma'am.

Q. Do you have a legal means of supporting your children?

A. Not as of right now.

The Children were placed in their current foster home directly from the hospital after their births, and they have remained with this foster family since that time. As a result, the foster parents are the only people the Children have ever identified as their parents. The foster parents wish to adopt the Children. Clearly, the continuation of Mother's

relationship with the Children greatly diminishes their chances of early integration into a permanent home. This is a fact that Mother admitted during her testimony:

Q [to Mother]. [H]ow long should your children have to wait for you to get your life together before they are able to have a stable, permanent home?
A. They shouldn't have to wait.

We agree. There is clear and convincing evidence to support the trial court's termination of Mother's parental rights on the ground of persistence of the conditions that led to the Children's removal from her custody.

### C. Substantial Non-Compliance with the Requirements of the Permanency Plans by Mother and Father

The trial court found, by clear and convincing evidence, that Mother and Father's respective parental rights should be terminated on the ground of failure to substantially comply with the requirements of the permanency plans. Tennessee Code Annotated section 36-1-113(g)(2) provides that a parent's rights may be terminated when "[t]here has been substantial noncompliance by the parent . . . with the statement of responsibilities in a permanency plan."

"[T]he permanency plans are not simply a series of hoops for the biological parent to jump through in order to have custody of the children returned." *In re C.S., Jr., et al.*, No. M2005-02499-COA-R3-PT, 2006 WL 2644371, at *10 (Tenn. Ct. App. Sept. 14, 2006). Rather,

the requirements of the permanency plan are intended to address the problems that led to removal; they are meant to place the parent in a position to provide the children with a safe, stable home and consistent appropriate care. This requires the parent to put in real effort to complete the requirements of the plan in a meaningful way in order to place herself in a position to take responsibility for the children.

*Id*. As discussed by this Court:

Terminating parental rights based on Tenn. Code Ann. § 36-1-113(g)(2) requires more proof than that a parent has not complied with every jot and tittle of the permanency plan. To succeed under Tenn. Code Ann. § 36-1-113(g)(2), the Department must demonstrate first that the requirements of the permanency plan are reasonable and related to remedying the conditions that caused the child to be removed from the parent's custody in the first place, *In re Valentine*, 79 S.W.3d 539, 547 (Tenn. 2002); *In re L.J.C.*, 124 S.W.3d 609, 621 (Tenn. Ct. App. 2003), and second that the parent's noncompliance

is substantial in light of the degree of noncompliance and the importance of the particular requirement that has not been met. *In re Valentine*, 79 S.W.3d at 548-49; *In re Z.J.S.*, No. M2002-02235-COA-R3-JV, 2003 WL 21266854, at *12 (Tenn. Ct. App. June 3, 2003). Trivial, minor, or technical deviations from a permanency plan's requirements will not be deemed to amount to substantial noncompliance. *In re Valentine*, 79 S.W.3d at 548.

*In re M.J.B.*, 140 S.W.3d at 656-57.

As discussed above, Mother's requirements under the permanency plans were to: (1) complete an alcohol and drug assessment; (2) attend a mental health assessment; (3) pass drug screens; (4) provide a safe and stable home for the Children; (5) notify DCS of changes in contact information; (6) maintain regular visitation; (7) pay child support; (8) provide prescriptions for medication; (9) complete a parenting class; (10) attend a psychological assessment; and (11) complete any requirements pertaining to her criminal charges. The trial court found that these requirements "were reasonable and related to remedying the conditions that necessitated foster care," and this finding is not disputed.

In its order terminating Mother's parental rights, the trial court found that Mother failed to substantially comply with the foregoing requirements. Specifically, the trial court's order states:

> In the first permanency plan dated August 9, 2018, Mother was responsible for completing an alcohol and drug assessment, attending a mental health assessment, passing drug screens, providing a safe and stable home for the children, notifying DCS of changes in contact information, maintaining regular visitation, and paying child support. Even though Mother attended the drug and alcohol assessment, she completed none of the other tasks. She did not attend a mental health assessment, failed numerous drugs screens, and missed numerous visits with the children. The Department did not know where Mother was living for months; so, she apparently did not notify DCS of changes to her contact information or provide a safe and stable home. Mother was in substantial noncompliance with the first permanency plan.
>
> The second permanency plan developed on December 10, 2019 added that Mother was to provide prescriptions for medication and complete a parenting plan. Mr. Boyd testified that Mother failed to complete any of the responsibilities outlined in the second plan. . . .
>
> In the third plan created on January 28, 2019, Mother['s] . . . responsibilities remained largely the same. The Department added that Mother was to attend a psychological assessment, which she did not complete during the third plan. She failed one drug screen but began showing improvement by passing two tests in April and May 2019. Mother, however,

- 13 -

still did not establish a suitable home, attend parenting classes, provide prescriptions, or regularly visit the children. . . .

The fourth plan was developed on May 28, 2019. The requirements for [Mother] remained largely the same but specific visitation requirements were listed. The plan also added that Mother [would] complete any requirements pertaining to [her] criminal charges. Mother attended the psychological evaluation during this plan. [Mother], however, failed a drug screen and the Department was unable to locate her again until she was incarcerated in December 2019. Mother was not in substantial compliance with the fourth plan.

The evidence supports the trial court's findings. Based on the many positive drug screens, it is apparent that Mother never addressed her substance abuse issues. Although she reported for assessments, Mother was not forthright in completing her intake information. For example, Trial Exhibit 21 is a letter from the Administrator at Here's Hope Counseling Center, LLC concerning Mother's initial assessment. The letter states that Mother "presented for intake assessment" and reported that she had not used illegal drugs in 30 days. As a result, Hope Counseling Center notified DCS that Mother did not meet the criteria for treatment. Mother's statement that she had been drug free for at least 30 days was in direct contravention of the fact that she tested positive for methamphetamine 13 days before this first assessment. Likewise, in Trial Exhibit 22 concerning Mother's second assessment at Professional Care Services of West Tennessee, the provider stated that Mother's defensive manner may have "led to an understatement of any substance abuse problem." Although Mother attended these assessments, she clearly failed to provide true and accurate information. As a result, Mother never truly addressed her drug abuse and continued to abuse illegal substances throughout the custodial episode as evidenced by the positive drug screens contained in Trial Exhibit 16.

Furthermore, Mother never addressed her mental health issues. Despite DCS' efforts to assist her, Mother failed to attend the mental health intake and failed to complete a parenting class. Moreover, Mother failed to pay any child support although she worked for over a year during these proceedings. In addition, as set out above, Mr. Boyd testified that Mother was often out of touch with DCS and failed to update her contact information. Mr. Boyd testified that, despite his efforts to locate Mother, he did not know her whereabouts throughout most of the custodial episode. On the rare occasions when Mr. Boyd could find Mother, he attempted to conduct home inspections, but Mother refused him entry. Mr. Boyd noted potential hazards outside the home and opined that the home would not have been a suitable environment for the Children. Finally, Mother failed to maintain regular visitation with the children. She missed numerous visits shortly after the Children's removal to DCS custody. Throughout the custodial episode, she attended only 24 of the possible 59 visits with the Children. Prior to her incarceration in November 2019, she last visited the Children on August 6, 2019 and did not see the children again until February 7, 2020. From the totality of the circumstances, we conclude that there is clear

and convincing evidence to support the trial court's termination of Mother's parental rights on the ground of failure to substantially comply with the requirements of the permanency plans.

Turning to Father, his requirements under the permanency plans were to: (1) attend and provide certificates that he completed: (a) mental health treatment, (b) parenting classes, and (c) alcohol and drug treatment; and (2) complete any requirements pertaining to his criminal charges. The trial court found that these requirements "were reasonable and related to remedying the conditions that necessitated foster care," and this finding is not disputed.

In its order terminating Father's parental rights, the trial court found, in relevant part:

> Mr. Boyd testified that Father failed to complete any of the requirements outlined in the second permanency plan. . . . Father was also required to complete any requirements pertaining to his criminal charges in addition to his prior responsibilities. The Department confirmed that Father had access to a parenting class through Carl Perkins during his incarceration in Obion County. Father claimed they discontinued the class. Father did not make any progress until the fourth permanency plan was created. On July 19, 2019, Father completed a 16-session course called Partners in Parenting. DCS raised concerns that the class [he] completed failed to address alcohol and drug issues. Father also completed Motivation to Change on November 29, 2019.
>
> Father has been incarcerated since February 2018, charged federally with conspiracy to distribute 50 grams or more of methamphetamine. He pled guilty to the federal charges, but testified that he filed a motion to have his plea set aside. He does not have a projected release date.
>
> During his incarceration, Father visited the children twice in person. He told DCS he was going to arrange for video visitation in the future and declined the Department's assistance in organizing future remote visitation. Video visitation between [Father] and the children never occurred.

The record supports the trial court's findings. Although Father was incarcerated during the pendency of this case, Mr. Boyd testified that Carl Perkins offered a parenting class that Father could have attended while he was incarcerated in Obion County. Despite this opportunity, the record shows that Father failed to complete any of his responsibilities as set out in the second and third permanency plans. In fact, Father did not complete any of his responsibilities until he attended a parenting class in November 2019. It is well settled that "[a]n incarcerated parent is not absolved of his or her parental responsibilities while in jail or prison." *In re Jonathan F*., No. E2014-01181-COA-R3-PT, 2015 WL 739638, *13 (Tenn. Ct. App. Feb. 20, 2015). However, incarceration is a relevant consideration when judging that parent's ability to fulfill his or her responsibilities to the

- 15 -

child." *Id.* In his brief to this Court, Father argues that his facility did not allow him to complete programs, and "as a result of the virus outside providers were not allowed into the facility." It is important to note that restrictions due to Covid-19 did not begin until at least February 2020. Accordingly, Father had more than a year before the onset of the pandemic to work on the plan requirements, but he failed to make any effort during that time. There is no evidence that Father has made any progress on the requirements concerning alcohol and drug treatment or mental health treatment. Furthermore, Father also failed to avail himself of the opportunity to participate in video visitation with the Children. For these reasons and more, there is clear and convincing evidence to support the trial court's termination of Father's parental rights on the ground of failure to substantially comply with the reasonable requirements of the permanency plans.

### D. Failure to Manifest an Ability and Willingness to Assume Custody by Mother and Father

Tennessee Code Annotated section 36-1-113(g)(14) provides a ground for termination of parental rights when

> [a] parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]

Tenn. Code Ann. § 36-1-113(g)(14).

This ground for termination of parental rights requires the movant to establish two elements by clear and convincing evidence. *In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *7 (Tenn. Ct. App. Apr. 4, 2018) (citation omitted). Concerning the first element, DCS has the burden to prove that Mother and Father failed to manifest an ability and willingness to personally assume legal and physical custody or financial responsibility of the Children. Tenn. Code Ann. § 36-1-113(g)(14). The Tennessee Supreme Court has adopted the interpretation of section 36-1-113(g)(14) set out in *In re Amynn K.*, No. E2017-11866-COA-R3-PT, 2018 WL 3058280 (Tenn. Ct. App. June 20, 2018); *see In re Neveah M.*, No. M2019-00313-SC-R11-PT, 2020 WL 7258044, at *14 (Tenn. Dec. 10, 2020) (citing *In re Amynn K.*, 2018 WL 3058280, at *14). The interpretation adopted by our Supreme Court

> places a conjunctive obligation on a parent or guardian to manifest both an ability and willingness to personally assume legal custody or financial responsibility for the child. If a parent seeking to terminate parental rights proves by clear and convincing evidence that a parent or guardian has failed to manifest either ability or willingness, then the first prong of the statute is

satisfied.

***In re Naveah***, 2020 WL 7258044, at *14.  If the first element is met, then DCS must show that placing the Children in Mother's and/or Father's custody poses "a risk of substantial harm to the physical or psychological welfare of the child[ren]." Tenn. Code Ann. § 36-1-113(g)(14). In this case, the trial court held that DCS met its burden of proof as to both of these elements *vis-à-vis* both parents, to-wit:

> Pursuant to Tenn. Code Ann. § 36-1-113(g)(14), clear and convincing evidence has established that both [Mother and Father] have failed to manifest an ability and willingness to care for the children and placing the children in either the Mother or Father's custody would pose a substantial harm to the children.
>
> Mother and Father are both currently incarcerated with no projected release date. Mother testified that once she is released, she has no home or a legal means to support the children. Even though Father stated he had a home and a job after his release, the fact that he does not have a release date means he is currently unable to provide for the children. Neither [Mother] nor [Father] [is] able to assume custody of the children currently or in the near future.
>
> Mother and Father both expressed a desire to be parents to the children and have a meaningful relationship. [Mother] and [Father], however, did not demonstrate that they were willing to assume a parental relationship with the children. [Father] visited the children only twice since he became involved in the case in December 2018. He declined the Department's assistance in setting up video visitation. Mother continued to test positive for methamphetamine and amphetamine. She is now facing criminal charges related to methamphetamines. [Mother] visited the children less than half of the scheduled visitations and never established a suitable home for the children. She failed to complete a parenting assessment or classes. Neither [Mother] nor [Father] demonstrated a willingness to assume custody of the children.
>
> Placing the children in Mother or Father's custody would pose a risk of substantial harm to the physical or psychological welfare of the children. . . . [The Children] have only seen [Father] twice in person. Even if he were not currently incarcerated, removing the children from a stable home to a near stranger poses a risk of substantial harm to the children. Mother visited more often but still has only seen the children 24 times in two years. Additionally, Mother's continued drug use and involvement with methamphetamine poses a substantial risk of harm to the children.
>
> The Court concludes that there is clear and convincing evidence that [Mother] and [Father] failed to manifest an ability and willingness to assume custody of the children pursuant to Tenn. Code Ann. § 36-1-113(g).

The record supports the trial court's findings. Both Mother and Father are incarcerated in federal prison; neither has a projected release date. As such, there is no indication that either will be able to assume custody at any near date.

Throughout these proceedings, Mother has asserted her desire for custody of the Children, yet she has failed to address, in any meaningful way, the issues that have inhibited her from having custody. In short, Mother's words are not supported by her actions. *See In re Jonathan M.*, No. E2018-00484-COA-R3-PT, 2018 WL 5310750, at *5 (Tenn. Ct. App. Oct. 26, 2018) ("When evaluating willingness, [courts] look for more than mere words."); *see also In re Cynthia P.*, No. E2018-01937-COA-R3-PT, 2019 WL 1313237, at *8 (Tenn. Ct. App. Mar. 22, 2019) (citation omitted) ("Parents demonstrate willingness by attempting to overcome the obstacles that prevent them from assuming custody or financial responsibility for the child."). Here, Mother wholly failed to address her drug use as evidenced by her positive drug screens and her ultimate incarceration for the sale of methamphetamine. She failed to attend more than half of the visits that DCS made available to her. She did not complete a mental health assessment, and she participated in parenting classes only after she was incarcerated in November 2019.

Likewise, Father has shown no willingness or ability to assume custody of the Children. Father's incarceration precludes his ability to assume custody. Despite his stated wish to maintain a meaningful relationship with the Children, Father took no steps toward that goal. He has only visited the Children two times since they were born. Although DCS offered to assist him with video visitation, Father declined and stated he would work with the facility to coordinate visits; however, there is no indication that he attempted any visitation through the facility.

As to the second prong of this grounds, i.e., that placing the children in Mother's or Father's custody would pose a risk of substantial harm to the Children's welfare, there is sufficient evidence to satisfy this criterion. There is no doubt that Mother's continued drug use and alleged engagement in the sale of methamphetamine pose a substantial risk of harm to the Children. However, from the Children's perspective, they have never lived with Mother or Father and have only known the home of their foster family. The evidence shows that the Children are bonded with their foster parents, who wish to adopt them. There is no question that removing the Children from this stable environment would pose the risk of substantial harm. *See In re Kash F.*, No. E2019-02123-COA-R3-PT, 2020 WL 5269228, at *7 (Tenn. Ct. App. Sept. 4, 2020) ("The record further supports a finding that placing [the child] with [mother] would pose a risk of substantial harm to [the child's] physical or psychological welfare given her failure to adequately address her drug abuse and his current placement in an adoptive home, the only home [the child] has ever known."). Furthermore, Father has spent only one-and-a-half hours with the Children during their entire lives. *See In re Braelyn S.*, No. E2020-00043-COA-R3-PT, 2020 WL 4200088, at *17 (Tenn. Ct. App. July 22, 2020) ("[T]here can be no dispute that [f]ather is a virtual stranger to the child. Other cases have held in similar situations that forcing the

- 18 -

child to begin visitation with a near-stranger would make psychological harm sufficiently probable"), *perm. app. denied* (Tenn. Dec. 10, 2020); *cf. **State v. C.H.H.**,* No. E2001-02107-COA-R3CV, 2002 WL 1021668, at *9 (Tenn. Ct. App. May 21, 2002) (affirming termination under Tenn. Code Ann. § 36-1-113(g)(9)(A)(v) and finding that granting custody to the father, who was a near stranger, would result in emotional harm to the child). Mr. Boyd opined that, in view of the Children's current placement and their bond with the foster family, placing the Children in the custody of either Mother or Father would pose a substantial risk of harm to their physical or psychological welfare. We agree. For the foregoing reasons, we conclude that there is clear and convincing evidence to support the trial court's termination of both Mother and Father's parental rights on the ground of failure to manifest an ability and willingness to assume custody.

## V. Best Interests

When at least one ground for termination of parental rights has been established, the petitioner must then prove, by clear and convincing evidence, that termination of the parent's rights is in the child's best interest. *In re Bernard T.*, 319 S.W.3d at 606 (citing *In re Adoption of A.M.H.*, 215 S.W.3d 793 at 809). As the Tennessee Supreme Court explained:

> Facts considered in the best interest analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." *In re Kaliyah S.*, 455 S.W.3d at 555 (citing *In re Audrey S.*, 182 S.W.3d at 861). "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest[s]." *Id*. When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." *In re Audrey S.*, 182 S.W.3d at 878. Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors. *Id*. "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child. . . ." Tenn. Code Ann. § 36-1-101(d) (2017).

*In re Gabriella D.*, 531 S.W.3d 662, 681-82 (Tenn. 2017).

The Tennessee Legislature has codified certain factors that courts should consider in ascertaining the best interest of the child in a termination of parental rights case. As is relevant to this appeal, these factors include, but are not limited to, the following:

> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best

interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

***

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i) (2018 Supp.). This list of factors is not exhaustive, nor does the statute "require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's rights is in the best interest of a child." ***In re M.A.R.***, 183 S.W. 3d 652, 667 (Tenn. Ct. App. Aug. 11, 2005), *perm. app. denied* (Tenn. Nov. 21, 2005). Each termination of parental rights case includes different circumstances, and the consideration of a single factor or other factors outside those enumerated in the statute, may dictate the outcome of the best interest analysis. ***In re Audrey S.***, 182 S.W.3d at 877. As explained by this Court:

Ascertaining a child's best interests . . . does not call for a rote examination of each of Tenn. Code Ann. § 36-1-113(i)'s [] factors and then a determination of whether the sum of the factors tips in favor of or against the parent. The relevancy and weight to be given each factor depends on the unique facts of each case. Thus, depending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis.

***White v. Moody***, 171 S.W.3d 187, 194 (Tenn. Ct. App. 1994). However, "[w]hen

considering the factors set forth in subdivision (i)(1), the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest." Tenn. Code Ann. § 36-1-113(i)(2).

In its order terminating Mother and Father's parental rights, the trial court made the following findings concerning the Children's best interests:

> Neither Mother nor Father have made an adjustment of circumstances that would make it safe and in the children's best interest to be in their home. Mother has not consistently worked with the Department to address any of the issues or concerns identified upon the children's removal. Even though she attended two alcohol and drug assessments, she failed 10 out of 13 drug screens. Her methamphetamine use continued almost unabated throughout the case, and she is now incarcerated on federal drug charges. Mother's circumstances have worsened throughout the past two years. Because both Mother and Father are incarcerated, neither has a home where the children could currently live. Neither [Mother] nor [Father] have a projected release date from their current incarceration.
>
> Mother and Father have also not made a lasting adjustment after reasonable efforts by social services agencies for such a duration of time that it does not reasonably appear possible. Despite the Department's efforts in ensuring that Father could take certain classes through Carl Perkins while incarcerated, he declined to take the class. Father did, however, complete a parenting class at another facility. Mother was offered substantial services, including therapeutic visitation, a psychological assessment, in home services through Camelot, parenting classes, transportation, a drug and alcohol assessment, drug screens. And Mother did attend the alcohol and drug assessments. [Mother], however, failed to attend over half of the offered visitations, declined transportation, did not complete the parenting classes or assessment, and continued to fail drug screens. Given Mother's lack of progress in two years despite the services provided, it appears unlikely that a lasting adjustment is reasonably possible in [her] case.
>
> Two years after the children's removal, and Mother has only visited the children 24 times out of 59 possible visits. She has missed over half of the visitations scheduled by DCS. Mother's only explanation for the missed visitation was her work schedule, but she admitted that she only worked about half of the time the case was pending prior to her incarceration. She offered no explanation as to why she declined transportation services that were offered to facilitate visitation. She has not maintained regular visitation or contact with the children. Father also has only visited the children twice in person since his involvement in the case began in December 2018. Further, he declined the Department's assistance in coordinating video visitation. Father has also not maintained regular visitation or contact with the children.

Because of the lack of visitation, neither Mother nor Father has developed a meaningful relationship with the children.

Neither parent has paid child support. [Father] has been incarcerated throughout the custodial episode. So, he has not been able to pay child support. This factor will not weigh against [him]. Mother, however, testified she was employed at times and was able to pay child support but did not. It is not in the best interest of the children for the Mother to not pay child support when she is able.

. . . Dr. Mays [] opined that Mother needed to attend therapy and that she would have a difficult time effectively parenting the children. Dr. Mays diagnosed Mother with bipolar disorder and believed that she would feel better with therapy, which would also be beneficial to the children. There is no indication that Mother attended therapy to address those concerns. Based on Dr. Mays's evaluation, this Court finds that Mother's mental and/or emotional status would be detrimental to the children or prevent her from effectively providing safe and stable care and supervision for the children.

Evidence was presented that Mother and Father both were involved in criminal activity involving drugs which raises significant concerns about their physical environment. Father is federally charged with conspiracy to distribute 50 grams or more of methamphetamine. He pled guilty to his charges but testified he had filed a motion to have his plea set aside. Mother failed 10 out of 13 drug screens for methamphetamine and amphetamine. She also now faces federal charges related to methamphetamine. This Court, therefore, finds that the children would not be cared for in a safe and stable manner by either Mother or Father given the criminal activity and drugs involved in their lives.

Finally, this Court concludes that a change in caretakers and physical environment would be detrimental to the children's emotional and psychological condition. The children were removed from Mother's custody 2 years ago and have been in the same foster home throughout this case. The testimony was unrefuted that changing caretakers at this stage of their lives would have a detrimental effect on the children because they are bonded with the foster family. The children have no meaningful relationship with either Mother or Father. The foster family wishes to adopt the children. To remove them from the only family they have ever known would be harmful to the children's well-being.

Based on the foregoing, the Court concludes by clear and convincing evidence pursuant to Tenn. Code Ann. § 36-1-113(i) that termination of [Mother] and [Father's] parental rights is in the children's best interest.

The record supports the trial court's findings. For the reasons previously discussed, each of the enumerated statutory factors, *supra*, weighs against both Mother and Father. Despite opportunities and services provided by DCS, neither biological parent has made

an adjustment of circumstance so as to provide a stable home for the Children. Both biological parents are incarcerated, and the Children have no bond with them. Mother and Father have wholly failed to support the Children and have barely taken the time to visit them. While Father has continued his incarceration, and Mother has continued her drug use, the Children have formed "a healthy parental attachment" with their foster parents, who wish to adopt them. Continuation of the parent/child relationship creates an impediment to the Children's full integration into their home—the only home they have known. Termination of Mother's and Father's parental rights is certainly in the Children's best interests.

## VI. Conclusion

For the foregoing reasons, we affirm the trial court's order terminating the parental rights of both Mother and Father. The case is remanded for such further proceedings as may be necessary and are consistent with this opinion. Costs of the appeal are assessed one-half to Appellant, Casey B., and one-half to Appellant, Christopher F. Because both Casey B. and Christopher F. are proceeding *in forma pauperis* in this appeal, execution for costs may issue if necessary.


_____s/ Kenny Armstrong_____
KENNY ARMSTRONG, JUDGE
